UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ALAN KAUFMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil A. No. 16-12027-LTS |
| | ) | |
| SONY PICTURES TELEVISION, INC., | ) | |
| AMERICAN BROADCASTING | ) | |
| COMPANIES, INC., FINNMAX LLC, | ) | |
| and COMCAST CORP., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER ON MOTION TO DISMISS (DOC. NO. 13)

July 19, 2017

SOROKIN, J.

I. INTRODUCTION

Plaintiff Alan Kaufman filed a pro se complaint in state court against Defendants American Broadcasting Company, Inc., Mark Burnett Productions, Inc., Sony Pictures Television, Inc., and Comcast Corporation alleging one count of negligence and one count of breach of fiduciary duty and covenant of good faith and fair dealing. Doc. No. 1-1. Defendants removed to this Court based on diversity. Doc. No. 1. They subsequently moved to dismiss Kaufman's Complaint under Fed. R. Civ. P. 12(b)(1), (2) and (6). Defendants' Motion to Dismiss is ALLOWED. Doc. No. 13.

II. FACTS

The allegations set forth in the Complaint, Doc. No. 1-1, surround Kaufman's appearance on the ABC reality television show Shark Tank. The Court considers "only facts and documents that are part of or incorporated into the complaint" and takes all reasonable inferences in the

plaintiff's favor. Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F/3d 315, 321 (1st Cir. 2008).

In 2009 Defendants approached Kaufman with the opportunity to appear on the pilot season of Shark Tank to attempt to get funding for his hands-free and wind resistant umbrella, Nubrella. Doc. No. 1-1 at ¶¶ 2, 7. He then participated in a number of Skype interviews and a background check. Id. at ¶ 8. In August 2009 Kaufman flew to Los Angeles, California to film for the show, though it was not certain that his segment would actually be aired. Id. at ¶ 9. In order to participate on the show, Kaufman signed a contract, the Participant Agreement.[1] Id. at 5. The Agreement provides the following:

> I acknowledge, understand and agree that if any dispute, controversy or claim arising out of or relating to this Agreement, the breach of any term hereof, or any effort by any party to enforce, interpret and/or construe, rescind, terminate or annul this Agreement, or any provision thereof, including without limitation the applicability of this arbitration provision, and any and all disputes or controversies relating in any manner to my appearance on or participation in the Series (collectively "Matters"), cannot be settled through direct discussions, the parties agree to endeavor first to settle the matter by mediation conducted in the County of Los Angeles and administered by JAMS under its Commercial Mediation Rules. If any matter is not otherwise resolved through direct discussions or mediation, as set forth above, then the parties agree that it shall be resolved by binding arbitration conducted in accordance with the arbitration rules and procedures of JAMS, though its Los Angeles, California office. Any such arbitration shall be conducted by a single, neutral arbitrator, who shall be a retired judge of a state or federal court, experienced in entertainment disputes, and selected from JAMS' panel of arbitrators proffered by its Los Angeles, California office. If the parties cannot agree upon an arbitrator after good faith discussion, the arbitrator shall be chosen by JAMS pursuant to the requirements of this paragraph. The parties agree that the arbitrator's ruling in the arbitration shall be final and binding and not subject to appeal or challenge. Judgement upon the award rendered by the arbitration may be entered in any court having jurisdiction thereof. As set forth more fully below, Producer, but not I, shall have the right to seek injunctive or other equitable relief pursuant to California Code of Civil Procedure Section 1281.8 and any successor or similar statute. In any and all other respects, the Federal Arbitration Act (9 U.S.C.

---

[1] The Participation Agreement can be properly considered with the Motion to Dismiss. See Cogan v. Phoenix Life Ins. Co., 310 F.3d 238, 241 n.4 (1st Cir. 2002).

2

§1, et seq.) or its successor statute shall apply and govern the enforcement of this arbitration clause.

Doc. No. 16-1 at 28, ¶ 66.

The episode featuring Kaufman originally aired on February 4, 2010 at 9:00 p.m. on ABC. Doc. No. 1-1 at ¶ 9. On the show, Kaufman accepted a $200,000 deal with Daymond John and Kevin Harrington for 51% ownership in his company. Id. at ¶ 10. Before John and Harrington could negotiate a distribution deal with perspective national retailers, Defendants asked Kaufman to reappear on the show in a "pre-scripted, fabricated" follow-up episode. Id. at ¶ 11-13. The purpose of this follow up episode was "to show the audience not only are [John and Harrington] following through with their proposed investment but playing an additional role in trying to help the companies invested in build, grown distribution by utilizing their clout and contacts." Id. at ¶ 11.

Defendants had instructed John "to find a so called distribution 'partner' for Kaufman for the sole purpose of making the audience believe [John and Harrington] indeed did **invest** but also were playing an **integral role in helping** their invested companies." Id. at ¶ 14. "Due [to] Mr. John's lack of ability and connection[s] to align [Kaufman's company] with a valid prominent national retailer he was left with pursing a falsified partnership with the recent bankrupt Sharper Image company" in the follow-up episode. Id. at ¶ 15. In 2001, Sharper Image had closed all 450 of their retail locations after they were forced to file for bankruptcy as a result of class action lawsuit brought against them by millions of consumers who had purchased defective air purifiers. Id. at ¶ 16. The follow-up episode featured a partnership between Kaufman and a private party who had bought the rights to the Sharper Image brand name. Id. at ¶ 17. This new company was not concerned with the "fabricated deal," in fact they were "delighted with the opportunity to get their name on national TV helping show the consumer the brand was still in

3

business." Id. at ¶ 18. "[P]laintiff was adamant about not wanting to participate in not only a 'fabricated' distribution deal but also associating its new brand with one of the most failed and hated retailers in the country." Id. at ¶ 19.

Subsequent to the taping of the follow-up episode featuring Kaufman, there was some disagreement about the deal reached on air and it was never carried out. Id. at ¶ 20. The original deal of $200,000 was ignored by the John and Harrington and a settlement for $20,000 was reached between the parties. Id. at ¶¶ 20-21. "At the present time of the settlement agreement, the current claim(s) could not be litigated as they were not present nor could be predicated." Id. at ¶ 22. After the settlement, Defendants began re-selling re-runs of both of the episodes featuring Kaufman. Id. at ¶ 23. Those reruns continue to air on CNBC and other international broadcasting networks that Kaufman is unaware of over six years later. Id. at ¶ 24. Due to Shark Tank's popularity and high ratings Defendants have received significant financial returns from selling these re-runs and from commercials. Id. at ¶¶ 49-50. "Plaintiff has estimated that just CNBC alone cycles through all of its Shark Tank episodes at least once per quarter." Id. at ¶ 44. "Thus . . . Plaintiff has estimated approximately 8 re-runs per year times 5 year[s] or 40 re-runs just with CNBC alone." Id. at ¶ 45.

In 2012, after his appearance on Shark Tank, Kaufman "returned to the design table" to made significant changes to his product, Nubrella. Id. at ¶ 26. He overhauled the design to add various enhanced features, ultimately resulting in a higher production cost and therefore a higher retail price than $29.99, as he originally stated on the show. Id. at ¶¶ 26-27, 30. When Defendants air re-runs of the show they do not notify the viewers of the date the episode originally aired or the fact that Kaufman's product has since changed. Id. at ¶¶ 30-31. Since ABC

is one of the largest networks in the world, the audience "100% believes everything they view on the show to be **true and accurate**" and up-to-date. Id. at ¶ 32.

Kaufman's Complaint, removed to this Court on the basis of diversity, alleges two counts. First, Kaufman alleges that Defendants are negligent in continuing to air the episodes because they show an older model of the product which was sold at a lower price, damaging his "reputation, brand image, and revenues." Id. at ¶¶ 25-32. Second, Kaufman claims that Defendants breached their fiduciary duty and the covenant of good faith and fair dealing because they do not reveal that the follow up episode is "fabricated and pre-scripted." Id. at ¶ 33. This had led to many consumers being upset and sending "negative sometimes threatening emails," negative internet reviews and even threats to contact the media. Id. at ¶ 31. "[The consumers] claim fraud, bait and switch and threats to call the show Shark Tank and John to complain about the fact he is not honoring the aired price of $29.99." Id. at ¶ 30. Additionally, this has also caused issues with Kaufman's ability to fundraise.

> The . . . distribution fabrication has . . . severely hampered the plaintiff's ability to secure distribution/ retail partners. Most all whom the plaintiff has met with have seen the plaintiff's Shark Tank follow up and assume that TV doesn't lie and indeed he plaintiff has partnered with the Sharper Image companies. Due to Sharper Image's serious litigation issues, its recent bankruptcy filing and closing of its stores has led to no one wanting to be associated with the brand name.

Id. at ¶ 37. Kaufman has repeatedly asked for an additional chance to come on the show and accurately update the audience on his business in order to reverse some of the damage that has been caused, but the Defendants have ignored him. Id. at ¶¶ 38-39, 52. Further, Defendants have never attempted to communicate with Kaufman about them having sold the rights of Shark Tank to networks all over the world or offered him any royalties generated from the sale. Id. at ¶¶ 41-43. "[Defendants] . . . sold the rights of the show to other networks . . . at their own discretion

purely to maximize revenues and profits all with no concern what effect this may have on the plaintiff's business." Id. at ¶ 42.

Defendants have moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(1), (2) and (6). Doc. No. 13. Defendants' arguments center on this Court being the incorrect venue and forum for Kaufman's complaints. Defendants point to the signed Participant Agreement which includes an arbitration clause that mandates for alternative dispute resolution options. Doc. No. 13-14. Kaufman's Opposition argues that the Participant Agreement, including the arbitration clause, is unconscionable and should not be enforced. Doc. No. 21. Defendants reply by reiterating that the Agreement is a binding contract that Kaufman voluntarily signed after consulting legal counsel and conducting an arm's length negotiation. Doc. No. 26. Additionally, Defendant Finnmax argues that this Court lacks personal jurisdiction over it. Doc. No. 13-14.

III. ANALYSIS

    a. STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff[]." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005) (quoting Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997)).

Because Kaufman is proceeding pro se, this Court construes his filings liberally. See Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 13 (1st Cir. 2004) ("[T]he fact that the plaintiff filed the complaint pro se militates in favor of a liberal reading."). Allegations made in a pro se complaint are held to less stringent standards than formal pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 520 (1972). Even so, "pro se status does not insulate a party from complying with procedural and substantive law." Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir.1997).

    b. SHARK TANK'S ARBITRATION CLAUSE

The Agreement Kaufman signed prior to his appearance on Shark Tank contains a section entitled "Dispute Resolution and Limitation of Remedies" which calls for arbitration for "any dispute, controversy or claim arising out of or relating to this Agreement . . . and any and all disputes or controversies relating in any manner to my appearance on or participation in the Series." Doc. No. 16-1 at 29 ¶ 66. Each of Kaufman's claims falls comfortably within the scope of any and all disputes or controversies relating in any manner to his appearance on or participation in the series. State and federal law requires dismissal in favor of arbitration when both parties have agreed to it in a signed contract or agreement. Broughton v. Cigna Healthplans of Cal., 988 P.2d 67, 72 (Cal. 1999); see also 9 U.S.C. § 2; Cal. Civ. Proc. Code § 1281. Thus, the Court must dismiss this case in favor of arbitration pursuant to the terms of the contract unless an exception applies. 9 U.S.C. § 2; Cal. Civ. Proc. Code § 1281.

    c. UNCONSCIONABILTY

Whether an arbitration clause is enforceable in a contract involving interstate commerce is governed by the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-14, as well as the California Arbitration Act, Cal Civ. Proc. Code § 1281, which governs this Agreement. See Doc. No. 16-1

at 26 ¶ 55 ("This agreement . . . shall be governed by and interpreted in accordance with the substantive laws of the State of California."). Under both Acts, arbitration agreements are favored and are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; Cal. Civ. Proc. Code § 1281. Kaufman asserts that the contract is unconscionable. Unconscionability is one ground for an arbitration clause to be found unenforceable. 9 U.S.C. § 2. "The party opposing arbitration . . . has the burden of proving the arbitration is unconscionable." Szetela v. Discover Bank, 118 Cal. Rptr. 2d 862, 866 (Cal. Ct. App. 2002).

Unconscionability has two elements. The first is procedural unconscionability which looks at the unequal bargaining power of the parties resulting in a level of "oppression" or "surprise." Armendariz v. Found. Health Psychcare Serv., Inc., 6 P.3d 669, 689 (Cal. 2000). The second is substantive unconscionability, which looks at whether the results "shock the conscience" because they are "overly harsh" or "one-sided." Id. To meet the burden of proof under California law, the plaintiff must show that the arbitration agreement meets both elements of unconscionability, though each element does not have to be present to the same degree. Id.

### i. PROCEDURAL UNCONSCIONABILITY

Under California law, procedural unconscionability "concerns the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression and surprise involved in the agreement." Chavarria v. Ralphs Grocery Co., 733 F.3d 916, 922 (9th Cir. 2013). The oppression inquiry focuses on "the weaker party's absence of choice and unequal bargaining power that results in 'no real negotiation.'" Id. (quoting A&M Produce Co. v. FMC Corp., 186 Cal. Rptr. 114, 121-22 (Cal. Ct. App. 1982)). The surprise inquiry "involves the extent to which the contract clearly discloses its terms as well

as the reasonable expectations of the weaker party." Id. (citing Parada v. Super. Ct., 98 Cal. Rptr. 3d 743, 757 (Cal. Ct. App. 2009)).

In Higgins v. Superior Court, 45 Cal. Rptr. 3d 293 (Cal. Ct. App 2006), the California Court of Appeal dealt with a signed agreement containing an arbitration clause in order to appear on a reality show. Id. at 295. In that case five orphaned siblings were living with acquaintances from their church and were chosen to appear on the show Extreme Makeover: Home Edition to have their acquaintances' home completely renovated. Id. at 296. Prior to their appearance, the siblings had to sign an Agreement which included an arbitration provision. Id. The siblings were given only five to ten minutes to read and sign the lengthy Agreement. Id. at 303. After the renovation, the acquaintances forced the siblings to move out of the house. Id. at 298. The siblings attempted to file a petition against the television producers for breach of their promise to provide the siblings with a home and negligent misrepresentation for continuing to rebroadcast their episode of Extreme Makeover, portraying a false narrative of the siblings' living situation. Id. The defendants argued that because the siblings signed the Agreement which contained an arbitration clause their claims had to be arbitrated outside of court. California's Second District Court of Appeal found that arbitration provision to be unenforceable due to it being unconscionable, both procedurally and substantively. Id. Procedurally, the Agreement was completely drafted by the Defendants, a powerful television production company, while the siblings were "young[,] unsophisticated and had recently lost both parents" and there is no evidence of any negotiations that took place between the parties to create the Agreement. Id. at 304. Additionally, the Agreement was made up of 24 page single-spaced pages and 72 numbered paragraphs, with the arbitration provision buried in the last section under the heading "Miscellaneous" without any bold or capitalized font to highlight it. Id. at 296, 304.

Substantively, the arbitration provision barred only the siblings from seeking appellate review of the outcome of the arbitration, but not the Defendants, creating a "harsh, one-sided" Agreement. Id. at 305.

The Higgins Court found a strong showing of procedural unconscionability due to the vulnerable nature of the young siblings and the placement of the arbitration provision at the end of the Agreement mixed in with twelve paragraphs of other miscellaneous topics that could easily be missed. Id. at 304. Those circumstances are not present here. First, the arbitration clause was fully disclosed in bold, capital letters under the section heading "Dispute Resolution and Limitation of Remedies." Doc. No. 16-1 at 28. Kaufman initialed each page and each section. Id. at 28-29. Kaufman has failed to sufficiently allege facts as to the surprise element of procedural unconscionability. As to the oppression element, while it appears there was no real negotiation between the parties, "[c]ommercial practicalities . . . dictate that unbargained-for terms only be denied enforcement where they are also substantively unreasonable." Lasao v. Stearns Lending Co., No. 2:10-CV-01864, 2011 WL 3273923, at *8 (D. Nev. July 29, 2011) (quoting A&M Produce Co., 186 Cal. Rptr at 122). Thus, the Court turns to substantive unconscionability.

          ii.   SUBSTANTIVE UNCONSCIONBILITY

Substantive unconscionability addresses the fairness and mutuality of the contract, in other worlds whether the terms of the contract impose similar limitations on each party or provide reasonable justification if it does not. Perez v. DirecTV Group Holdings, LLC, No. 8:16-CV-1440, 2017 WL 1836357, at *11 (C.D. Cal. May 1, 2017). "[A] contract can provide for a margin of safety that provides the party with superior bargaining strength a type of extra

protection for which it has a legitimate commercial need without being unconscionable." Baltazar v. Forever 21, Inc., 367 P.3d 6, 15 (Cal. 2016); see also Cal. Civ. Code § 1670.5.

In Higgins, the arbitration provision was deemed to be "one sided" due to the unequal options of relief afforded to the two parties without a valid justification for the difference. 45 Cal. Rptr. 3d at 305. Here, the Agreement limits both Kaufman and Defendants to a majority of the same legal remedies in the same forum, at least initially. The Agreement states that "[i]n agreeing to arbitration, *both producer and I* acknowledge that we have waived the right to a jury trial." Doc. No. 16-1 at 29-30 (emphasis added). The Agreement also provides:

> I acknowledge . . . [that] all disputes or controversies relating in any manner to my appearance on or participation in the Series (collectively "Matters"), cannot be settled through direct discussions, the parties agree to endeavor first to settle the matter by mediation conducted in the County of Los Angeles and administered by JAMS under its Commercial Mediation Rules. If any matter is not otherwise resolved through direct discussions or mediation, as set forth above, then the parties agree that it shall be resolved by binding arbitration conducted in accordance with the arbitration rules and procedures of JAMS, though its Los Angeles, California office.

Doc. No. 16-1 at 28 ¶ 66. This paragraph calls for both parties to first discuss the issue among themselves then use mediation in the County of Los Angeles. If mediation is unsuccessful, the parties will arbitrate under the rules of the Judicial Arbitration and Mediation Services, Inc. (JAMS), which will result in a binding final decision not subject to appeal or challenge. Id. Within each of the aforementioned alternative methods of dispute resolution, both parties are limited to only monetary damages. Id. This is largely contrasted from Higgins, where only the petitioners were required to arbitrate their claims, as evidenced by the repeated use of "I" instead of "the parties," as used here. 45 Cal. Rptr. 3d at 304-05; Doc. No. 16-1 at 28 ¶ 66.

However, here, under certain limited circumstances only the Defendants have the right to seek injunctive or other equitable relief. Id. at 29 ¶ 68. The Agreement states, "Producer, *but not*

11

*I*, shall have the right to seek injunctive or other equitable relief pursuant to California Code of Civil Procedure section 1281.8 and any successor or similar statute." Doc. 16-1 at 28 ¶ 66 (emphasis added). The Agreement goes on to validate this caveat by highlighting the fragility of the television reality competition business where divulging certain information prematurely can result in large financial losses not covered by monetary damages to Defendants:

> I further acknowledge and agree that the business realities of reality competition television production, including the Series, create special circumstances for which Producer must be able to maintain its ability to seek injunctive relief and/or other equitable and/or provisional remedies. For example, a participant's premature or threatened disclosure in violation of the confidentiality or publicity provisions of this Agreement could result in a reduction of audience interest or their diminution in the value of the Series or SPT, and/or Network irreparable injury and damage that could not be law. Accordingly, under such circumstances, Producer, SPT and Network hereby reserve the right to seek injunctive relief and I hereby expressly agree that Producer, SPT and Network shall be entitled to injunctive and other equitable relief, without posting any bond, to prevent and/ or cure any breach or threatened breach of this Agreement.

Id. at 29 ¶ 68. The contract itself spells out the "legitimate commercial need" for the lopsided provision. Baltazar, 367 P.3d at 15.

This provision is markedly different from that in Higgins, where only the petitioners were barred from seeking appellate review after arbitration. 45 Cal. Rptr. 3d at 305. This Agreement states, "*[t]he parties* agree that the arbitrator's ruling in the arbitration shall be final and binding and not subject to appeal or challenge." Doc. 16-1 at 29 ¶ 66 (emphasis added). Even with the provided justification and relevant statute, this Court recognizes that the presence of injunctive and other equitable relief options allotted only to Defendants, in certain situations, creates some potential level of substantive unconscionability in this Agreement. However, the burden is on Kaufman to set forth sufficient factual allegations to challenge the legitimate commercial need for the different treatment. Kaufman has failed to do this.

Because Kaufman's Complaint does not make out a factual basis for either procedural or substantive unconscionability, the contract and its arbitration clause are valid and enforceable. Kaufman must follow the procedure set forth in the contract to resolve his disputes with Defendants.

IV. <u>CONCLUSION</u>

The Motion to Dismiss, Doc. No. 13, is ALLOWED under Fed. R. Civ. P. 12(b)(1). Accordingly, the Court need not reach Defendants' other arguments or Finnmax's personal jurisdiction argument.

                                                  SO ORDERED.

                                                  /s/ Leo T. Sorokin  
                                                  Leo T. Sorokin  
                                                  United States District Judge